NOT DESIGNATED FOR PUBLICATION

No. 123,085

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of D.S.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GERALD R. KUCKELMAN, judge. Opinion filed May 28, 2021. Reversed and remanded with directions.

*Chadler E. Colgan*, of Colgan Law Firm, LLC, of Kansas City, for appellant.

No brief filed by appellee.

Before GREEN, P.J., SCHROEDER, J., and WALKER, S.J.

PER CURIAM: The natural mother of D.S. (Mother) appeals from the district court's finding of unfitness and termination of her parental rights, arguing: (1) The evidence did not support a finding of unfitness and (2) termination of her parental rights was not in D.S.'s best interests. As explained below, we agree with Mother. We reverse and remand for further proceedings.

FACTS

In July 2018, a private petition for adjudication of a child in need of care (CINC) was filed concerning D.S., then 16 years old. The petition alleged Mother ordered D.S. to leave her home in June 2018 and had not spoken to him in a month. The petitioner, D.S.'s paternal grandmother (Grandmother), further alleged D.S.'s natural father (Father) was in

1

prison, had been absent for more than a year, would remain absent for several more months, and had not provided financial or emotional support for D.S. for several years. The petition sought the appointment of Grandmother as custodian for D.S. The district court appointed a guardian ad litem (GAL) for D.S. Father filed a response, agreeing an emergency existed and Grandmother was a proper custodian for D.S. He further alleged Mother had ordered D.S. out of her home on several occasions and had been physically and emotionally abusive.

In October 2018, the district court held a hearing, adjudicated D.S. a CINC, and appointed Grandmother as custodian. At the November 2018 review hearing, the district court ordered the GAL to begin preparing a reintegration plan and for Mother and D.S. to begin participating in family counseling. The district court further assigned a court-appointed special advocate (CASA), Cathy Stueckemann, for D.S. In December 2018, another hearing was held, and the district court ordered the GAL to continue working on a reintegration plan and ordered family counseling to continue. At the January 2019 hearing, the district court ordered family counseling to continue but suspended supervised visits. Grandmother filed a motion in March 2019, asking the district court to find reintegration was no longer viable, terminate Mother's parental rights, and appoint Grandmother as permanent custodian.

At the review hearing in June 2019, the district court found reintegration was no longer viable. An evidentiary hearing for determination of Mother's parental rights was set for September 2019. Mother testified D.S. had lived with her until June 2018. She claimed D.S. was abusive toward his younger siblings—ages 9, 10, and 11—who lived in the family's home. Mother described an incident in June 2018 where D.S. caused significant damage to his adult sister's apartment. As a result, D.S. was charged with criminal damage to property. Around that time, Mother had been hospitalized due to illness. When she got out of the hospital, Mother tried to get D.S. to go to her home. But D.S. caused significant damage to Mother's home and ran away. Mother promptly filed a

2

police report, indicating D.S. was a runaway, and she did not learn of his whereabouts for a month.

Mother was aware D.S. had multiple court cases and was going to be in juvenile court in Leavenworth County. Mother attended a hearing at what she believed was the scheduled time, but D.S. was not present. She learned the hearing had actually occurred earlier in the morning and D.S. had been released to Grandmother's custody after the hearing. Mother claimed Grandmother never contacted her to inform Mother of D.S.'s whereabouts. Mother was aware D.S. wished to remain in Grandmother's home. She initially attended visits with D.S. as arranged by Stueckemann; however, D.S. would not talk to Mother during the visits, so family therapy was suggested.

Mother wanted to do family therapy with Walt Louis, who she had previously used for the same purpose while D.S. was living with her. But Grandmother wanted Mary Spickelmier to provide therapy because she was already doing individual therapy for D.S. Mother complained Spickelmier did not communicate with her regarding D.S.'s other doctor or dental appointments. She indicated she discontinued therapy sessions with Spickelmier in February or March 2019 because she was unable to arrange for payment for the sessions. Mother testified she had not had any contact with D.S. since their last therapy session. She had not contacted D.S. by telephone, text, or social media. And she had not paid for any of D.S.'s care, nor had she offered to reimburse Grandmother for any such costs. Mother's testimony reflected she had done little to ensure D.S. was physically cared for since July 2018 while also recognizing D.S. was living with Grandmother.

However, Mother asserted she was never given a court order for support payments to Grandmother, nor was she provided with a court-approved reintegration plan. Mother believed she was emotionally supporting D.S. by asking for therapy and visits through Stueckemann. But Mother admitted she had only met with Stueckemann one time at her office and claimed she was never contacted for another meeting. Mother was not

3

surprised to learn D.S. was doing much better in Grandmother's custody, and she did not contest Stueckemann's report stating D.S. was much better overall living with Grandmother.

Stueckemann testified she had been appointed as D.S.'s CASA advocate to be a voice for him in court and look after him. Stueckemann stated she met with Mother once at her office and subsequently requested a home visit through texts and phone calls to Mother, but Mother made it clear she did not want Stueckemann coming to her home. Stueckemann explained to Mother she needed to come to her home and make observations for her reports in order for a reintegration plan to work. Stueckemann submitted numerous reports detailing her interactions with D.S. and others involved in the case. She noted D.S. made considerable progress while in Grandmother's care and showed no regression over the time she observed—November 2018 through September 2019. Stueckemann recommended D.S. remain in Grandmother's custody.

Grandmother testified she saw D.S. walking on the street in Leavenworth in June 2018. She stopped to talk to him, and D.S. told her Mother had ordered him out of her house. Grandmother gave D.S. her phone number and some money. Grandmother later learned D.S. had an outstanding juvenile warrant and picked him up so he could turn himself in to the authorities. The following day, a court hearing was scheduled for 10 a.m., but D.S. had been brought over much earlier. Because Grandmother was the only relative present, the district judge released D.S. to her custody at the conclusion of the hearing. Grandmother admitted she did not contact Mother to inform her of D.S.'s whereabouts. She generally described a tense history with Mother and did not want Mother to have D.S. removed from Grandmother's home.

D.S.'s older sister, A.S., also testified at the termination hearing. A.S. generally corroborated Mother's account of D.S.'s abusive behavior toward his siblings and destruction of property in Mother's home. She further stated Mother had provided for her

4

children and sought assistance as needed—particularly, using Louis for family therapy. According to A.S., Mother had a fairly strict set of rules and expectations for the children, which D.S. frequently would not follow. A long-time family friend, D.J., also testified, indicating she had known Mother since she was 13 years old and had known D.S. his entire life. At various times, Mother and the children had stayed with D.J. She never observed any physically or emotionally abusive conduct by Mother toward D.S. or any of the other children. D.J.'s only concern was Mother's strict rules and expectations for the children.

After the conclusion of the evidence, Mother indicated she would consent to D.S. remaining in Grandmother's custody but did not believe her parental rights should be terminated. She further indicated she was willing to sign a permanent custodianship for D.S. to remain with Grandmother. The parties agreed they would prepare the necessary documentation to do so, and the district court set the following Friday as the deadline to submit documentation for entry of final orders. However, Mother never signed or filed a consent to permanent custodianship, and the district court entered a finding of unfitness and termination of parental rights in November 2019. The district court found Mother was unfit based on the following statutory factors:

- Conduct toward the child of a physically or emotionally abusive nature under K.S.A. 2020 Supp. 38-2269(b)(2);
- Failure of reasonable efforts by appropriate public or private agencies to rehabilitate the family under K.S.A. 2020 Supp. 38-2269(b)(7);
- Lack of effort on the part of Mother to adjust her conduct of conditions to meet the needs of the child under K.S.A. 2020 Supp. 38-2269(b)(8); and
- The child had been out of the home under court order in the custody of the Secretary for the Kansas Department for Children and Families (DCF) for 15 of the prior 22 months under K.S.A. 2020 Supp. 38-2269(b)(9).

The district court made additional findings that:

"The child has been out of the mother's home since June 9, 2018, residing with [Grandmother], during which time the mother has failed to assume care of the child in the mother's home when able to do so; failed to maintain regular visitation, contact or communication with the child or the custodian of the child, failed to carry out a reasonable plan directed toward reintegration of the child into her home; failed to pay any costs of substitute care or maintenance of the child based on her ability to pay; and has otherwise failed to assume the duties of a parent toward the child. Furthermore, the relationship between the child and mother has deteriorated to the point . . . there is open hostility by the child directed toward the mother, based upon prior actions by the mother, which counseling and therapy has failed to remedy and it is impossible for the mother/child relationship to exist."

The district court held Mother's parental rights were terminated consistent with D.S.'s best interests. It noted Father had previously consented to the appointment of Grandmother as permanent custodian. Mother timely appealed. Father is not a party to this appeal and has not filed a brief. Grandmother has also not filed a brief. Based on D.S.'s age at the time of the termination hearing (17 years old), he is no longer a minor.

ANALYSIS

Mother argues the district court erred in finding her unfit. She further argues the district court erred in terminating her parental rights. As previously noted, D.S. is no longer a minor child.

*Standard of review and applicable legal principles*

A parent has a constitutionally recognized right to a parental relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d

6

599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Accordingly, parental rights for a child may only be terminated upon clear and convincing proof of parental unfitness. K.S.A. 2020 Supp. 38-2269(a); *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, 1113, 336 P.3d 903 (2014).

As provided in K.S.A. 2020 Supp. 38-2269(a), the district court must find "by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." In reviewing a district court's termination of parental rights, we view all the evidence in the light most favorable to the prevailing party to determine whether a rational fact-finder could have found it highly probable by clear and convincing evidence that parental rights should be terminated. *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011). In making this determination, we do not "weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. at 705.

Upon making a finding of unfitness of the parent, the district court must "consider whether termination of parental rights . . . is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2020 Supp. 38-2269(g)(1). The district court makes the best-interests determination based on a preponderance of the evidence, which is essentially entrusted to the district court acting within its sound judicial discretion. See We review a court's best-interests determination for an abuse of discretion,

> "which occurs when no reasonable person would agree with the district court or the
> district court premises its decision on a factual or legal error. In determining whether the
> district court has made a factual error, we review any additional factual findings made in
> the best-interests determination to see that substantial evidence supports them. [Citation
> omitted.]" *In re R.S.*, 50 Kan. App. 2d at 1116.

7

The party asserting the trial court abused its discretion bears the burden of showing such abuse of discretion. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

*Termination of Mother's parental rights not warranted*

The district court relied on four statutory factors to find Mother unfit, none of which are supported by clear and convincing evidence when viewed in a light most favorable to the prevailing party below.

The district court first found Mother engaged in cruel or abusive conduct toward D.S. See K.S.A. 2020 Supp. 38-2269(b)(2). But the district court provided no pertinent factual findings to support this conclusion, and there was no evidence presented showing Mother engaged in such conduct. Specifically, there was no testimony showing Mother physically or emotionally abused D.S. There were never any allegations of sexual abuse. There was an allegation in Grandmother's motion for termination of parental rights that D.S. was upset Mother was attempting to regain custody of him. Father made unsubstantiated and conclusory allegations against Mother in his pleadings; however, Father never testified at any time during the proceedings.

With no factual findings by the district court, it was legally erroneous to conclude Mother physically or emotionally abused D.S. Reasonable efforts by the Mother to regain custody of her child cannot reach the level of emotionally abusive conduct. Moreover, the statements of Father are unsubstantiated and cannot be considered.

The district court's second basis, finding there was a failure of reasonable efforts by appropriate public or private agencies to work toward reintegration of D.S. into Mother's home, is not supported by the record. See K.S.A. 2020 Supp. 38-2269(b)(7). The record fails to reflect any real agency involvement in this case. The usual agencies

8

such as DCF, St. Francis Ministries, and KVC were not involved; this was a private action initiated by Grandmother. Stueckemann, as D.S.'s CASA, described limited contact with Mother, but her testimony did not reflect any concrete case plan tasks Mother failed to carry out. The record fails to reflect any testimony regarding the parameters of a case plan or even if such plan existed. The district court ordered the GAL to prepare a reintegration plan at the November and December 2018 hearings. However, Mother never received a court-approved reintegration plan, and we can find no court-approved plan in the record.

There was testimony regarding Mother's past use of Louis to help with D.S. But Louis did not testify at the termination hearing. There was also testimony regarding Mother and D.S. attending therapy with Spickelmier, but Spickelmier did not testify at the termination hearing. In short, there was little to no evidence presented about any specific tasks Mother needed to complete to get D.S. back into her home, and no evidence was presented regarding the nature of therapy; its success, if any; and what further benefit, if any, additional therapy could or would have for the family. The district court's reliance on this factor is not supported by clear and convincing evidence even when considered in a light most favorable to the party prevailing below.

The district court's third finding may have some merit, but we do not find it rises to the level of clear and convincing evidence. Here, the district court relied on K.S.A. 2020 Supp. 38-2269(b)(8)—"lack of effort on the part of the parent to adjust the parent's circumstances, conduct or condition to meet the needs of the child." Prior to leaving Mother's home, D.S. was a difficult child who got into legal trouble, fought with his siblings, and did poorly in school. Stueckemann testified D.S.'s demeanor changed considerably when he began living with Grandmother. He did much better in school, expressed excitement and optimism about his future, and seemed to appreciate the importance of working hard and getting an education.

Mother admitted she had not had any contact with D.S. since discontinuing therapy in February or March of 2019. Mother further admitted she had not paid for any of the costs for D.S.'s care since he began living with Grandmother, nor had she offered to reimburse Grandmother for those expenses.

Mother indicated she only met once with Stueckemann during the pendency of the case. Mother also admitted to having very little contact with D.S.'s school and essentially no contact with Grandmother during the pendency of the case. When asked why she had so little contact, Mother seemed to suggest Grandmother and the school should have contacted her. When asked why she discontinued therapy with Spickelmier, Mother offered somewhat confusing answers. The specifics of this point are unclear from the record. However, in her brief, Mother admits she did not pay any costs for therapy not covered by her insurance and stopped attending therapy "because of the arrangements on who was responsible for payment." At the termination hearing, Mother expressed confidence in her ability to provide for D.S. and claimed she had sufficient income to do so. Although unemployed, Mother testified she received approximately $2,600 per month from social security disability payments and child support from the fathers of her other children.

Mother described very minimal efforts, if any, to work toward reintegration with D.S. on *her own* initiative. But what plan was she to comply with? The record further fails to reflect what, if anything, she did to cause D.S.'s social and behavioral problems before he ran away from her home and ended up living with Grandmother. A family friend, D.J., testified she never saw Mother physically or emotionally abuse D.S. or any of the children; her only concern was Mother was very strict with her rules for the children. D.S.'s older sister, A.S., described Mother's efforts to parent the children came with strict expectations and rules. According to A.S., D.S. would not listen to Mother or follow her rules, D.S. picked on the other children, and D.S. destroyed property in Mother's home. A.S. testified Mother was able to provide for the children and reached out

10

for assistance as needed, such as counseling with Louis. We find the evidence in the record does not sufficiently support the district court's conclusion Mother failed to make efforts to adjust her circumstances, conduct, or condition to meet D.S.'s needs.

Finally, the district court found K.S.A. 2020 Supp. 38-2269(b)(9) applied. However, that factor does not apply unless the minor child has been in an out-of-home placement in the custody of the Secretary of DCF for 15 of the past 22 months. While D.S. had been out of Mother's home for 13 to 14 months at the time of the termination hearing, D.S. was never in DCF custody because this action arose from a private petition filed by Grandmother, who was appointed as custodian. This last statutory factor was legally and factually erroneous.

Although D.S. improved while living with Grandmother, his improvement does not justify termination of Mother's parental rights by clear and convincing evidence, even when considered in a light most favorable to the party prevailing below. Without a concrete plan for Mother to follow, it is hard to find she failed to adjust to meet the needs of D.S. As the record reflects, D.S. was 17 years old and was being difficult. He failed or refused to participate in family counseling with Mother. It appears he liked living with Grandmother and was doing whatever it took on his part to continue living with Grandmother. Again, there was never a plan established for Mother to work toward to meet the needs of D.S.

The district court provided some additional findings. Most of these additional findings, to varying extents, are not supported by the record. The basis for the district court's finding D.S. displayed "open hostility toward [Mother]" is unclear. D.S. did not testify at the termination hearing. But this finding may have general support as an inference based on A.S.'s testimony regarding D.S.'s defiance of Mother's rules and Grandmother's and Stueckemann's testimony regarding D.S.'s apprehension about returning to Mother's home. However, we can find no support in the record for the district

court's conclusion such hostility was "based upon prior actions of the mother." The record fails to show how "counseling and therapy failed to remedy" the issues between D.S. and Mother since neither of the therapists who worked with the family testified at the termination hearing.

There was little to no evidence reflecting Mother's *prior* actions caused D.S. to leave her home, and Mother did not affirmatively do anything to worsen the parent-child relationship after D.S. left. Here, the issue is almost entirely what Mother *did not* do, as opposed to anything Mother did. The district court's rationale for finding Mother's parental rights should be terminated is not supported by clear and convincing evidence in the record even when considered in a light most favorable to the party prevailing below.

*Best interests of the child*

Because we have found termination of Mother's parental rights was not supported by clear and convincing evidence in the record, we need not address whether termination was in D.S.'s best interests.

The district court erred by finding there was clear and convincing evidence to find Mother unfit. We therefore reverse the district court's finding of unfitness and order terminating Mother's parental rights and remand the case for the district court to determine whether further proceedings are required or if the matter should be dismissed as set out in K.S.A. 2020 Supp. 38-2203(c)-(d).

Reversed and remanded with directions.